UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


PAUL DUROUSSEAU,

      Petitioner,

v.                                   Case No. 3:22-cv-1356-JEP-PDB

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,

      Respondent.

_____

## **ORDER**

**THIS CAUSE** is before the Court on Petitioner's counseled Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2254 ("**Petition**," Doc. 1), Respondent's Response to the Petition (Doc. 9), and Petitioner's Reply (Doc. 12) thereto.[1] Upon review, no evidentiary proceedings are warranted in this Court.[2] For the reasons set forth below, the Petition is denied.

---

[1] For purposes of reference to pleadings and exhibits, the Court will cite the document numbers and page numbers assigned by the Court's electronic docketing system.

[2] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." *Jones v. Sec'y, Fla. Dep't of Corrs.*, 834 F.3d 1299, 1318 (11th Cir. 2016) (citing *Chavez v. Sec'y Fla. Dep't of Corrs.*, 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise

## I.   PROCEDURAL HISTORY

On June 19, 2003, Paul Durousseau ("**Durousseau**") was indicted in Duval County Circuit Court case number 2003-CF-6686[3] for the first-degree murders of Nichole Lashawn Williams, Nikia Shannell Kilpatrick ("**Kilpatrick**"), Shawanda Denise McCallister ("**McCallister**"), Jovanna Tyrica Jefferson, and Surita Ann Cohen.[4] (*See* Doc. 10-34 at 4–5). On September 4, 2003, Durousseau was indicted in Duval County Circuit Court case number 2003-CF-10182 for the first-degree murder of Tyresa Mack ("**Mack**"). (Doc. 10-2; Doc. 10-34 at 6).

Durousseau's trial for Mack's murder commenced on May 23, 2007, during which the State introduced collateral crime evidence regarding Kilpatrick's and McCallister's murders. (*See* Doc. 10-4). On June 8, 2007, the jury found Durousseau guilty as charged of Mack's murder, and found that the killing was both premeditated and done during the commission of sexual

---

precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.* The Court finds that "further factual development" is unnecessary. *Turner v. Crosby*, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

[3] The Court takes judicial notice of Petitioner's state court dockets. *See Paez v. Sec'y, Fla. Dep't of Corrs.*, 947 F.3d 649, 651–52 (11th Cir. 2020) (holding that a district court may take judicial notice of online state court docket sheets in ruling on a petition for writ of habeas corpus).

[4] The indictment also included two counts of aggravated child abuse. (*See* Doc. 10-34 at 4–5).

battery and robbery. (Doc. 10-32 at 327; *see also* Docs. 10-4, 10-5, 10-6, 10-7, 10-8, 10-9, 10-10, 10-11, 10-12, 10-13, 10-14, 10-15, 10-16, 10-17). On June 28, 2007, the jury recommended a death sentence by a vote of ten-to-two, which the trial court adopted on December 13, 2007. (Doc. 10-3; *see also* Docs. 10-17, 10-18, 10-19, 10-20, 10-21; Docs. 1695, 1696 in No. 2003-CF-10182).

Durousseau appealed his conviction and death sentence. (*See* Docs. 10-22, 10-23, 10-24; Docs. 1722, 1725 in No. 2003-CF-10182). After hearing oral argument on February 10, 2010, the Florida Supreme Court affirmed Durousseau's conviction and death sentence in a written opinion on December 9, 2010, denied Durousseau's motion for rehearing on February 21, 2011, and issued the mandate on March 9, 2011. *See Durousseau v. State*, 55 So. 3d 543 (Fla. 2010), *cert. denied*, *Durousseau v. Florida*, 565 U.S. 839 (2011).

On October 1, 2012, Durousseau filed a motion for postconviction relief under Florida Rules of Criminal Procedure 3.850 and 3.851. (Doc. 1769 in No. 2003-CF-10182). After an evidentiary hearing on April 9–10, 2015, the trial court denied the motion on June 26, 2015. (Docs. 1815, 1921, 1922, 1931 in No. 2003-CF-10182). While Durousseau's appeal of the denial was pending, the United States Supreme Court decided *Hurst v. Florida*, 577 U.S. 92 (2016), holding that Florida's death penalty sentencing statute violated the Sixth Amendment. (*See* Docs. 10-25, 10-26, 10-27; Doc. 1940 in No. 2003-CF-10182).

3

After receiving supplemental briefs on the impact of *Hurst*, on January 31, 2017, the Florida Supreme Court affirmed the trial court's denial of postconviction relief on the ineffective assistance of counsel claims, but vacated Durousseau's death sentence as unconstitutional under *Hurst* and remanded for a new penalty phase. *See Durousseau v. State*, 218 So. 3d 405 (Fla. 2017). On May 5, 2017, the Florida Supreme Court denied Durousseau's motion for rehearing, and issued the mandate on May 22, 2017. (Doc. 10-30).

Before the new penalty phase, on October 4, 2019, the trial court granted Durousseau's motion to prohibit the admissibility of evidence of other crimes, wrongs, or acts during the penalty phase. (*See* Doc. 11-1; Doc. 2299 in No. 2003-CF-10182). The court explained:

> The Court finds the evidence the State seeks to introduce of other crimes, wrongs or acts is relevant to proving the [Cold, Calculated, and Premeditated] aggravator, Pecuniary Gain aggravator, and to rebut mental mitigation of limited cognitive functioning. The crimes are substantially similar to, and exhibit unique characteristics of, the instant offense. Further, there is nothing to suggest the passage of time between, and the order of, the crimes had any effect on the reliability of the evidence. However, the Court finds the evidence's probative value is substantially outweighed by the danger of unfair prejudice to [Durousseau].

(Doc. 11-1 at 2). The State appealed the ruling by filing an amended petition for writ of certiorari on October 17, 2019, which the Florida Supreme Court

4

denied on December 28, 2020.[5] *See State v. Durousseau*, No. SC20-297, 2020 WL 7693135 (Fla. Dec. 28, 2020); (Docs. 10-31, 10-33, 10-35). After a new penalty phase, on December 10, 2021, the trial court resentenced Durousseau to life in prison without the possibility of parole. (*See* Doc. 11-2; Doc. 2565 in No. 2003-CF-10182). Durousseau timely filed his Petition in this Court. (Doc. 1).

## II.   LEGAL STANDARD

### A.   AEDPA

Pursuant to the Antiterrorism Effective Death Penalty Act ("**AEDPA**"), a federal court may not grant federal habeas relief with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

---

[5] The petition was originally filed in Florida's First District Court of Appeal, which transferred it to the Florida Supreme Court on February 28, 2020. (*See* Doc. 10-31).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Sec'y for Dep't of Corrs.*, 432 F.3d 1292, 1308 (11th Cir. 2005). The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*:

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

244 F.3d 831, 835 (11th Cir. 2001) (quoting *Williams*, 529 U.S. at 412–13). Even if the federal court concludes that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable."[6] *Id.* (quotation omitted).

---

[6] In considering the "unreasonable application inquiry," the Court must determine "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409. Whether a state court's decision was an unreasonable application of law must be assessed in light of the record before the state court. *Holland v. Jackson*, 542 U.S. 649, 652 (2004); *see also Bell v. Cone*, 535 U.S. 685, 697 n.4 (2002) (declining to consider evidence not presented to the state court in determining whether the state court's decision was contrary to federal law).

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). However, the state court's "determination of a factual issue . . . shall be presumed correct," and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Parker*, 244 F.3d at 835–36.

### B.    Exhaustion and Procedural Default

Before bringing a § 2254 habeas action in federal court, a state prisoner must exhaust all state court remedies that are available for challenging his conviction. *See* 28 U.S.C. § 2254(b)(1)(A). To do so, he must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. *Castille v. Peoples*, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust their claims, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999), thereby alerting the appropriate state court to "the federal nature of the claim[s]," *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *see also Pope v. Rich*, 358

7

F.3d 852, 854 (11th Cir. 2004) (noting "that *Boerckel* applies to the state collateral review process as well as the direct appeal process").

A state prisoner's failure to properly exhaust available state remedies results in a procedural default, which raises a potential bar to federal habeas review. Under the doctrine of procedural default:

> [A] federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. *See, e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 747–748 (1991); *Wainwright v. Sykes*, 433 U.S. 72, 84–85 (1977). A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. *See, e.g.*, *Walker v. Martin*, 562 U.S. 307, 316 (2011); *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. *See Coleman*, 501 U.S. at 750.

*Martinez v. Ryan*, 566 U.S. 1, 9–10 (2012) (internal citations modified).

"To show cause, the petitioner must demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court." *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Once cause is established, "the petitioner also must show actual prejudice from the alleged constitutional violation." *Id.* (citing *Sykes*, 433 U.S. at 84). "[I]n order to show prejudice, a

petitioner must demonstrate that 'the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness.'" *Id.* (quoting *McCoy v. Newsome*, 953 F.2d 1252, 1261 (11th Cir. 1992)).

In the absence of a showing of cause and prejudice, a petitioner may still receive consideration on the merits of a procedurally defaulted claim if he can show that a fundamental miscarriage of justice would occur:

> "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Carrier*, 477 U.S. at 496. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001).

*Ward*, 592 F.3d at 1157 (internal citations modified). "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." *Johnson*, 256 F.3d at 1171 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup*, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. *Schlup*, 513 U.S. at 324.

9

## III.   DISCUSSION

As Ground One, Durousseau alleges the trial court violated his Fifth and Fourteenth Amendment due process rights by allowing the State to introduce collateral crime evidence related to Kilpatrick's and McCallister's murders, for which he had not been tried or convicted. (Doc. 1 at 10). Durousseau argues the collateral crime evidence so infected his trial that it rose to a level of fundamental unfairness and violation of due process because of the combination of the following factors: (1) the lack of evidence, other than collateral crime evidence, to obtain a conviction in the Mack case; (2) the State's failure to show, by clear and convincing evidence, that Durousseau was responsible for Kilpatrick's and McCallister's murders; and (3) that the collateral crime evidence became a central feature of the Mack trial. (*Id.* at 11).

Durousseau raised similar claims in his amended initial brief and reply brief before the Florida Supreme Court, which rejected his claims and affirmed his conviction and death sentence in a written opinion. *See Durousseau*, 55 So. 3d at 548–50. Significantly, Durousseau's state court briefs raised these claims only in the context of state law. (*See* Docs. 10-22, 10-24). He made no argument or reference to the United States Constitution or any decision by the United States Supreme Court. (*See id.*) Because he did not fairly present the federal

nature of his claims, he deprived the Florida Supreme Court of a meaningful opportunity to review them. *See Baldwin*, 541 U.S. at 29.

Durousseau now argues that "by the time the Florida Supreme Court's decision was issued, due process had been substantively discussed by both the State and the defense, and by justices from both the majority and [the] dissent" during the oral argument. (Doc. 12 at 7; *see also id.* at 3–4 (citing to excerpts from the oral argument available at https://wfsu.org/gavel2gavel/viewcase.php?eid=58 (last visited Mar. 4, 2026)). According to Durousseau, "[e]xhaustion is satisfied by those actions, irrespective of how [his] counsel initially presented the issue in [the state court] briefing." (Doc. 12 at 7–8). In presenting this argument, Durousseau cites to Justice Pariente's dissenting opinion, asserting that there was a due process violation in the Mack case. *See Durousseau*, 55 So. 3d at 566 (Pariente, J., dissenting) (Quince, J., concurring with the dissent) ("Allowing a trial court to admit collateral crime evidence solely on the basis of the similarity of the crimes makes it possible to admit the evidence without first connecting the defendant to the collateral crime through the presentation of clear and convincing evidence—a violation of our case law and *due process*." (emphasis added)).

The Court finds that Durousseau did not exhaust his federal due process claim. First, it is undisputed that neither his amended initial brief nor his reply brief filed with the Florida Supreme Court alleged a violation of his federal constitutional rights. (*See* Docs. 10-22, 10-24). Moreover, Durousseau never attempted to amend or supplement his state court briefs to add a federal due process claim. As such, the Florida Supreme Court's written opinion understandably rests only on state law grounds. *See* 55 So. 3d 543. It is true that counsel and three of the justices mentioned "due process" several times during the oral argument,[7] but those references did not put the state court on notice that Durousseau intended to bring a *federal* due process claim, which is plainly confirmed by both the majority and dissenting opinions. *See id.*

When the substance of a claim is identical under state and federal law, a petitioner is required to put the state court on notice that his claim rests on a federal legal theory. *See Duncan v. Henry*, 513 U.S. 364, 365–66 (1995); *Pringle v. Sec'y, Fla. Dep't of Corrs.*, No. 21-14318, 2024 WL 3936915, *7–8

---

[7] During the one-hour-and-six-minutes oral argument, due process was mentioned: four times by Justice Pariente (at 8, 33, 37, and 40 minutes); once by Justice Canady (at 37 minutes); once by Justice Quince (at 38 minutes); once by Durousseau's counsel (at 18 minutes); and twice by the State (at 59 and 60 minutes). There were also references to "bootstrapping" made by Durousseau's counsel and Justice Pariente during the oral argument, as well as in Justice Pariente's dissenting opinion. *See Durousseau*, 55 So. 3d at 564, 566.

(11th Cir. 2024)[8] (finding that *Duncan* "forecloses Pringle's argument that the coextensive nature of the due process guarantees under the United States and Florida Constitutions alerted the state courts to the federal and state nature of her faulty jury instructions claim," and explaining that "petitioners must apprise the state courts of the federal nature of their claim, even if they present the substance of a federal claim"); *see also Preston v. Sec'y, Fla. Dep't of Corrs.*, 785 F.3d 449, 458 (11th Cir. 2015) (stating that "a petitioner with a claim that could arise under either state or federal law must clearly indicate to the state courts that he intends to bring a federal claim"). "If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court." *Duncan*, 513 U.S. at 366. "It is not enough that all the facts necessary to support the federal claim were before the state courts, . . . or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982). "Thus, to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues." *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998).

---

[8] Any unpublished decisions cited in this Order are deemed persuasive authority on the relevant point of law. *See McNamara v. GEICO*, 30 F.4th 1055, 1061 (11th Cir. 2022).

Durousseau did not assert in his state court briefs or even during the oral argument that he intended to raise a federal claim, he did not mention any federal constitutional provision, and he did not cite any federal case. Thus, the Court finds that Durousseau failed to exhaust his state court remedies. *See Preston*, 785 F.3d at 458–59 & n.6 (holding that a petitioner failed to exhaust his state court remedies when he never asserted in state court briefing that he intended to raise a federal claim, did not cite any federal cases or mention any federal constitutional provision, and did not reference the case setting out the applicable federal legal standard for his claim, even though at oral argument his counsel "suggested for the first time that [the petitioner had] couched his motion for judgment of acquittal before the trial court in terms of federal due process"); *see also Johnson v. Florida*, 32 F.4th 1092, 1096–97 (11th Cir. 2022) (finding that a petitioner failed to exhaust his state court remedies when he grounded his speedy-trial claim on state law and never cited the Sixth Amendment except in a motion to proceed pro se); *Pringle*, 2024 WL 3936915, at *5 ("Pringle's state court briefing referenced 'the Constitution or the laws of the United States' but otherwise presented the jury instruction claim as involving state law alone. This is insufficient to fairly present a federal claim to the state courts.").

14

Durousseau's "failure to exhaust means that his federal claim has been procedurally defaulted." *Preston*, 785 F.3d at 462. Further, Durousseau has not shown cause and prejudice, or any factor warranting the application of the fundamental miscarriage of justice exception to overcome the procedural default. *Harris v. Reed*, 489 U.S. 255, 262 (1989). Therefore, his claims in Ground One must be denied as unexhausted and procedurally defaulted.

Nevertheless, even if the claims in Ground One were not procedurally defaulted, they would still be denied for the reasons stated below. In a written opinion, the Florida Supreme Court rejected Durousseau's claims on the merits. *Durousseau*, 55 So. 3d at 550–56. First, the Florida Supreme Court summarized the pertinent facts and procedural history as follows:

> On July 26, 1999, between the hours of 9:30 a.m. and 1 p.m., Mack and a friend applied for employment at various business establishments. Eyewitnesses placed Durousseau at Mack's Jacksonville apartment sometime between noon and 2 p.m. One of the eyewitnesses saw Durousseau carrying a television out of the apartment and watched as he placed it in his car. The last time anyone heard from Mack was around 1:25 p.m. that afternoon when Mack spoke with a friend on the phone. Mack did not pick her children up from daycare that day and missed a 3 p.m. doctor's appointment for her youngest child. Around 7 p.m. that same evening, Mack's sister and her stepfather went to Mack's apartment in an attempt to locate her. At that time, they discovered Mack's body, lying in a semi-fetal position on the bed. Her body was nude from the waist down and a white cord was wrapped around her neck. The living room television and a "X's and O's" necklace and bracelet set that Mack always wore were missing. Durousseau's DNA was found in Mack's vagina and the medical examiner concluded that Mack died from asphyxia.

15

On June 23, 2003, Durousseau was indicted on five counts of first-degree murder for the murders of Nichole Williams, Nikia Kilpatrick, Shawanda McCallister, Jovanna Jefferson, and Surita Cohen. The similar methodology employed by the perpetrator, as well as DNA evidence from each crime scene, caused investigators to conclude that Mack was one of Durousseau's victims. On August 26, 2003, Durousseau was arrested for the murder of Mack. While in the booking area, Detective Rodney McKean informed Durousseau that he was being formally charged with the murder of Mack. Durousseau stated, "I don't know no [Tyresa] Mack." When the police informed him that Mack had been murdered on Florida Avenue, Durousseau responded, "I don't know that girl." On September 4, 2003, Durousseau was charged, by separate indictment, with the murder of Mack. The trial court permitted the State to introduce *Williams*[1] rule evidence of the Kilpatrick and McCallister murders. At the close of the State's evidence, Durousseau moved for judgment of acquittal, which was denied. On June 8, 2007, the jury found Durousseau guilty of first-degree murder.

FN1: *Williams v. State*, 110 So. 2d 654 (Fla. 1959).

During the penalty phase, the State alleged the existence of four aggravators: (1) Durousseau was previously convicted of a felony involving the use or threat of violence, (2) the murder was committed while the defendant was engaged in the commission of a robbery or sexual battery, (3) the murder was committed for pecuniary gain, and (4) the murder was especially heinous, atrocious, or cruel (HAC). Durousseau asserted the existence of the following statutory mitigating circumstances: (1) Durousseau's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired at the time he committed the murder, and (2) Durousseau suffered from an extreme mental or emotional disturbance at the time of the murder. He presented two mental health experts and seventeen lay witnesses. Durousseau also presented evidence of seventeen non-statutory mitigators.

16

. . . . The trial court gave great weight to the jury recommendation of death and concluded that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court sentenced Durousseau to death. . . .

*Durousseau*, 55 So. 3d at 548–50.

Then, the Florida Supreme Court addressed and rejected Durousseau's claim that the trial court abused its discretion in admitting the *Williams*-rule evidence. *Id.* at 550–51. The court explained:

First, we conclude that the collateral crime evidence established that Durousseau committed substantially similar crimes on two other occasions, which was relevant to several material issues, including identity and premeditation. The *Williams* rule evidence was clearly relevant given Durousseau's theory of defense that an unknown person entered Mack's apartment and killed her almost immediately after she engaged in consensual intercourse with Durousseau.

Second, we hold that the collateral crime evidence did exhibit unique similarities that established a modus operandi sufficient for proving identity. . . . In the instant case, there are identifiable points of similarity that pervade the compared factual situations. The facts in the charged crime and collateral crimes established that each victim was a young, black woman of similar stature,[7] who either had young children, was pregnant, or both.[8] Each victim was found partially nude from the waist down in or near her bedroom with a home-use cord wrapped around her neck. The cause of death in each homicide was asphyxiation. Durousseau's DNA was found inside of, or near, each victim's person, although his fingerprints were not found at any of the crime scenes. Each victim lived along the St. Johns River and their apartments were within a five-mile radius of each other.

> FN7: Mack was twenty-four years old and had short, curly black hair, was five feet four inches tall and 122 pounds. Kilpatrick was twenty years old, had short,

17

curly black hair, was five feet five inches tall and weighed 145 pounds. McCallister was twenty years old, had short, curly black hair, was five feet five inches tall and weighed 161 pounds.

FN8: Mack was not pregnant and lived with her three young children. Kilpatrick was pregnant and lived with her two young children. McCallister was pregnant.

Durousseau contends that those similarities are merely general in nature and claims that there was much dissimilarity at each crime scene. Durousseau notes that the cords found around each of the victims' necks were different and had been tied or draped around each victim's neck in a different manner. He also claims that each victim's body exhibited different physical trauma. However, "[t]his Court has never required the collateral crime to be absolutely identical to the crime charged." *Gore v. State,* 599 So.2d 978, 984 (Fla. 1992). Dissimilarities are not fatal when they "seem to be a result of differences in the opportunities with which [the defendant] was presented, rather than differences in modus operandi." *Id.*; *see Chandler v. State,* 442 So. 2d 171, 173 (Fla. 1983). A review of the record makes clear that the dissimilarities between the crimes, as alleged by Durousseau, are merely differences in opportunity. The different ligatures used in each homicide do not amount to dissimilarity, as suggested by Durousseau. It is not the difference of the home-use cord type, but his employment of the same tactic to obtain a murder weapon in each case that makes the home-use cords a similarity. Each victim appeared to have been bound or restrained in some way. Mack's arms exhibited indentations consistent with ligature bindings. Kilpatrick's arms and legs exhibited indentations consistent with ligature bindings, but, due to the level of decomposition, the medical examiner was unable to determine whether ligatures had in fact been used. McCallister's feet were bound, a belt had been wrapped around her wrist, and her arms exhibited marks consistent with having been bound. Additionally, appliance cords were missing from several of the crime scenes. The presence of indentations on each victim and the absence of the cords points to a similarity, rather than a dissimilarity. Further, each victim

18

sustained different types of trauma, which indicates that each victim may have reacted or fought back in a different manner.[9] Thus, the dissimilarities cited by Durousseau are more correctly categorized as differences in the opportunities presented to Durousseau.

> FN9: Mack suffered from abrasions to her face. The medical examiner opined that such abrasions were consistent with her face moving back and forth across a towel that was found beneath her head. Kilpatrick suffered from blunt force trauma to the head.

Additionally, Durousseau alleges that the charged and collateral crimes are too remote in time because Kilpatrick and McCallister were killed three and one-half years after Mack. "[R]emoteness of a prior crime is one aspect of its relevance, its tendency to prove or disprove a material fact in issue." *Duffey v. State,* 741 So. 2d 1192, 1197 (Fla. 4th DCA 1999) (citing *McGough v. State,* 302 So. 2d 751, 754 (Fla. 1974)); *see Williams*, 110 So. 2d at 662; *Griswold v. State,* 77 Fla. 505, 82 So. 44, 49 (1919); § 90.401, Fla. Stat. (1997). In such an instance, "the trial court must consider not the passage of time alone, but the effect of the passage of time on the evidence . . . . [It] precludes the use of evidence that has become unverifiable." *Duffey,* 741 So. 2d at 1197 (quoting *Heuring v. State,* 513 So. 2d 122, 123 (Fla. 1987)). "[T]he trial court should take into account that the 'absence of similar conduct for an extensive period of time which might suggest that the conduct has ceased to be a characteristic of the defendant.'" *Duffey,* 741 So. 2d at 1197 (quoting *Heuring,* 513 So. 2d at 124). This Court has upheld the admission of similar fact evidence occurring twenty years before the charged offenses where "the passage of time . . . did not affect the reliability of the evidence." *Heuring,* 513 So. 2d at 124. In the case at bar, there is nothing to suggest that the passage of a little over three years affected the reliability of the evidence. *See, e.g.*, *Burke v. State,* 835 So. 2d 286, 289 (Fla. 5th DCA 2002) (ruling that the passage of twenty-two years did not taint the evidence nor prejudice the defendant). Nor is there any indication that the conduct ceased to be a characteristic of Durousseau.

19

Next, we conclude that the probative value of the collateral crime evidence substantially outweighed any danger of unfair prejudice. Relevant similar fact evidence that is admissible under section 90.404(2) is subject to the requirements of section 90.403, Florida Statutes (1999). Such evidence is inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or needless presentation of cumulative evidence." § 90.403, Fla. Stat. (1999). Most evidence that is admitted will have a prejudicial or damaging effect to the party against whom it is offered. *See Wuornos v. State*, 644 So. 2d 1000, 1007 (Fla. 1994). "The real question is whether that prejudice is so unfair that it should be deemed unlawful." *Id.* The probative value of collateral crime evidence in the instant case comes from the fact that the collateral crimes were committed with a unique modus operandi that was the same as that used in the crime in question; therefore, it may be inferred that the same person committed both crimes. In determining whether the probative value is substantially outweighed by unfair prejudice, the court should consider the effectiveness of the cautionary instruction. *Bennett v. State,* 593 So. 2d 1069 (Fla. 1st DCA) (citing *United States v. Clemons,* 676 F.2d 122 (5th Cir. 1982)), *quashed on other grounds,* 599 So. 2d 997 (Fla. 1992).

In the instant case, the trial court provided the jury with a limiting instruction as to the proper purpose of the collateral crime evidence prior to the State's introduction of the collateral crime evidence. The trial court instructed the jury as to the proper purpose of the evidence:

> THE COURT: Members of the jury, before this witness begins her testimony the evidence you are about to receive concerning evidence of other crimes allegedly committed by the defendant will be considered by you for the limited purpose of proving motive, intent, identity, or the absence of mistake or accident on the part of the defendant and you shall consider it only as it relates to those issues. Let's proceed.

At the close of the evidence, a similar limiting instruction must be given. *See* § 90.404(2)(b)2, Fla. Stat. (1999); *McLean v. State,* 934

20

So. 2d 1248 (Fla. 2006). Here, at the close of all of the evidence, the trial court did provide a similar instruction:

> THE COURT: As to the killing of Nikia Kilpatrick, the evidence which has been admitted to show similar crimes, wrongs, or acts allegedly committed by the defendant will be considered by you only as that evidence relates to proof of motive, intent, identity, or the absence of mistake or accident on the part of the defendant.
>
> As to the killing of Shawanda McCallister, the evidence which has been admitted to show similar crimes, wrongs, or acts allegedly committed by the defendant will be considered by you only as that evidence relates to proof of intent, identity, or the absence of mistake or accident on the part of the defendant.

When collateral crime evidence is introduced, the trial court need only instruct the jury at the time of admission, if so requested, and after the close of the evidence. *Rivers v. State,* 425 So. 2d 101, 102 (Fla. 1st DCA 1982). Here the trial court did both.

As to Durousseau's fourth claim, we hold that the collateral crime evidence did not become an impermissible feature of the trial. Durousseau argues that the collateral crime evidence became an impermissible feature of the trial because the presentation of the collateral crime evidence composed two-thirds of the trial. Allowing the collateral crime evidence to become an overwhelming feature of the trial is reversible error. *Bush v. State,* 690 So. 2d 670, 673 (Fla. 1st DCA 1997). However, this Court has stated that "collateral crime evidence does not become an impermissible feature of the trial simply because it is voluminous." *Peterson v. State,* 2 So. 3d 146, 156 (Fla. 2009) (citing *Townsend v. State,* 420 So. 2d 615 (Fla. 4th DCA 1982)). In the instant case, the State introduced collateral crime evidence of the Kilpatrick and McCallister murders to prove identity. Out of the six murders for which Durousseau had been indicted, the State limited the collateral crime evidence to only the Kilpatrick and McCallister

murders in order to "(1) facilitate more streamlined discovery and a quicker, more efficient trial and (2) to avoid similar crime evidence becoming a feature of the trial." Additionally, the trial court gave a limiting instruction to the jury as to the proper purpose of the evidence prior to its admission and at the close of the evidence as required under section 90.404(2)(c)2. At trial, the State presented testimony from only one medical examiner, one serologist,[10] and one detective regarding the Mack, Kilpatrick, and McCallister murders. Throughout the three-week trial, eight lay witnesses testified over a period of only one day regarding Kilpatrick's murder. In addition, over a period of one-and-one-half days, eight witnesses testified regarding the McCallister murder. Approximately three hundred exhibits were placed into evidence throughout the trial. The State introduced approximately thirty-eight photographs from McCallister's case and approximately fourteen photographs from Kilpatrick's case. These photos were all introduced to show similarities between the crime scenes. Thus, the trial court did not allow the similar fact evidence to become an impermissible feature of the trial.

> FN10: Although several serologists presented testimony, only one testified regarding the victims. The other serologists presented evidence regarding the defendant's DNA.

Last, Durousseau contends that the trial court erred in failing to provide a special instruction to the jury as requested by defense counsel. Durousseau argues that the failure to do so led to juror confusion because the standard instruction did not distinguish between the burden of proof for the primary crime and collateral crimes. He also asserts that juror confusion resulted because the standard instruction did not make it clear whether the jury had to find that Durousseau actually committed the collateral crimes. We disagree. The decision to provide a particular instruction to the jury is within the discretion of the trial court. *Duest v. State,* 855 So. 2d 33, 41 (Fla. 2003) (citing *Card v. State,* 803 So. 2d 613, 624 (Fla. 2001)). "Weighing the evidence is the sole prerogative of the jury and the trial court should give an instruction without weighing the evidence." *Cruz v. State,* 971 So. 2d 178, 182 (Fla. 5th DCA 2007) (citing *Mathews v. State,* 799 So. 2d 265, 266 (Fla. 1st

DCA 2001)). When collateral crime evidence is introduced, the trial court need only instruct the jury at the time of admission, if so requested, and after the close of the evidence. *Rivers,* 425 So. 2d at 102. Here the trial court did both. "[T]o be entitled to a special jury instruction, [the defendant] must prove that: (1) the special instruction [is] supported by the evidence; (2) the standard instruction [does] not adequately cover the theory of defense; and (3) the special instruction [is] a correct statement of the law and not misleading or confusing." *Wheeler v. State,* 4 So. 3d 599, 605 (Fla. 2009) (second alteration in original) (quoting *Stephens v. State,* 787 So. 2d 747, 756 (Fla. 2001)). The trial court's limiting instructions prior to the presentation of the evidence and at the close of the evidence precluded any juror confusion that could have resulted from admission of the collateral crime evidence. The jurors were aware that the collateral crimes were admitted for the limited purposes of identity or premeditation. Once admitted, *Williams* rule evidence is treated like any other evidence that the jury may accept or reject. Thus, the trial court did not err in failing to instruct the jury that they had to find Durousseau committed the collateral crimes. Accordingly, we hold that the trial court did not abuse its discretion in admitting the *Williams* rule evidence.

*Durousseau*, 55 So. 3d at 551–56 (internal citations modified or omitted).

Under the deferential standard for federal court review of state court adjudications and upon thorough review of the record and the applicable law, the Florida Supreme Court's adjudication of Durousseau's claims was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). Contrary to Durousseau's position, the use of collateral crime evidence did not become an impermissible feature of the Mack trial;

there was sufficient evidence, even without the collateral crime evidence, to support Durousseau's conviction for first-degree murder; and the State sufficiently showed that Durousseau was responsible for the two collateral crimes.[9] During the guilt phase, the State presented eighteen witnesses[10] pertaining to Mack's murder; twelve witnesses[11] pertaining to Kilpatrick's murder, two of which also testified pertaining to Mack's murder (Sheree Enfinger and Margarita Arruza) and five of which also testified pertaining to McCallister's murder (David Smith, Gregory Brock, Larry Denton, Martin Tracey, and Margarita Arruza); and twelve witnesses[12] pertaining to McCallister's murder. (*See* Docs. 10-4, 10-5, 10-6, 10-7, 10-8, 10-9, 10-10, 10-

---

[9] When the Florida Supreme Court concluded that "the collateral crime evidence established that Durousseau committed substantially similar crimes on two other occasions," it noted that "[f]ederal caselaw employs an even lesser burden for the admission of collateral crime evidence." 55 So. 3d at 551 & n.6. Specifically, in a federal criminal case, the trial court "is not required to weigh credibility or make a finding that the government has proved the conditional fact," but rather, "the court examines all of the evidence and decides whether the jury could reasonably find by a preponderance of the evidence that the defendant committed the crime in question. *Id.* at n.6 (citations omitted).

[10] These witnesses were Sharabia Mack, Mike Laforte, Nicole Jackson, Tezalyn McFadden, Danielle Wallace, Joy Williams, Rufus Pinkney, Herb Brinson, Rodney McKean, Glenn Simpson, Jerome Chester, Katie Erdman, John Crawford, Sonya Core, Charles Coughlin, Sukhan Warf, Sheree Enfinger, and Margarita Arruza.

[11] These witnesses were Sara Anthony, John Frascello, Rhonda Sherrer, Larry Brown, Shantrell Green, Natoca Durousseau, David Smith, Gregory Brock, Larry Denton, Sheree Enfinger, Martin Tracey, and Margarita Arruza.

[12] These witnesses were Shaquita Jones, Rasheed Topey, Christy Conn, William Lake, Lanita Hicks, Darryl Lemon, David Smith, Kimberly Barron, Gregory Brock, Larry Denton, Martin Tracey, and Margarita Arruza.

24

11). Some of these witnesses were also called by the defense, including Sukhan

Warf, Rasheed Topey, Shaquita Jones, David Smith, Rodney McKean, Sara

Anthony, and Sharabia Mack.[13] (*See* Docs. 10-12, 10-13, 10-14, 10-15).

Durousseau argues that the collateral crime evidence became an

impermissible feature of the Mack trial because it composed two-thirds of the

trial. But, as the Florida Supreme Court noted, "collateral crime evidence does

not become an impermissible feature of the trial simply because it is

voluminous." *Peterson,* 2 So. 3d at 156 (citation omitted)). Considering that two

collateral murders were involved, much of the "testimony was unavoidable."

*Conde v. State*, 860 So. 2d 930, 946–47 (Fla. 2003) (affirming the introduction

of evidence regarding five collateral murders presented over the course of three

days in the prosecution of a sixth murder); *see also Peterson,* 2 So. 3d at 156

(affirming the introduction of evidence regarding three collateral robberies,

which were "sufficiently similar to the charged crime to be probative of

identity," and noting that while many of the witnesses testified briefly, "much

---

[13] The following additional witnesses were called by the defense: Timothy Look, Kathleen Baker, Milton Bowles, Adam Moss, Latasha Bell, Lamar Odom, Scott Johnson, Easley Lamar Baker, Michelle Royal, Trevonda Porter, and Kevin Noppinger (pertaining to Mack's murder); Ivory Durham, Derrick Lewis, Richard Kocik, and Jennifer Facey-Simms (pertaining to Kilpatrick's murder); Victoria Topey, Robin Todd, Julia Torjusen, Andrew Ewing, LaGloria Bronner, Deborah King, William Bothe, Robert Pate, Kevin Haines, and Mark Gillette (pertaining to McCallister's murder); and Larry Brown, Stanton Kessler, and Petitioner Durousseau (pertaining to all three murders). (*See* Docs. 10-12, 10-13, 10-14, 10-15).

of the testimony was unavoidable due to the number of robberies involved"); *Wuornos*, 644 So. 2d at 1006 (finding that evidence of five collateral murders was not "needless 'overkill'" where it was relevant to refute the defendant's claim of self-defense (quoting *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978)[14])). Also, it appears the State compressed its presentation of the collateral crime evidence by calling six lay witnesses[15] to testify on a single day (May 25, 2007) regarding Kilpatrick's murder, and seven lay witnesses[16] to testify on the next court date (May 29, 2007) regarding McCallister's murder. (*See* Docs. 10-6, 10-7, 10-8). Importantly, the trial court repeatedly instructed the jury regarding the proper purpose of the *Williams*-rule evidence. (*See* Doc. 10-6 at 111 (a *Williams*-rule instruction before the first witness, Sara Anthony, testified regarding Kilpatrick's murder); Doc. 10-7 at 80 (a *Williams*-rule instruction before the first witness, Shaquita Jones, testified regarding McCallister's murder); Doc. 10-16 at 191–92 (a *Williams*-rule instruction before the jury deliberations began)). Accordingly, when the presentation of

---

[14] All Fifth Circuit decisions entered before October 1, 1981 were adopted by the Eleventh Circuit as binding precedent. *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[15] The other two witnesses from that day testified regarding Mack's murder (Sonya Core) and McCalister's murder (Shaquita Jones). (*See* Docs. 10-6, 10-7).

[16] Another lay witness (Katie Erdman) testified on that day regarding Mack's murder. (*See* Docs. 10-8, 10-9). The rest of the witnesses on May 29–31, 2007 were employees of the Florida Department of Law Enforcement and other experts. (*See* Docs. 10-9, 10-10, 10-11).

the collateral crime evidence is considered in the context of a nearly three-week

trial, during which some witnesses testified about two or three of the murders,

it is apparent that the collateral crime evidence did not become an

impermissible feature of the Mack trial.

Moreover, there was sufficient evidence, even without the collateral

crime evidence, to support Durousseau's conviction. In addressing the

sufficiency of the evidence, the Florida Supreme Court stated:

> Regardless of whether [Durousseau] challenges the sufficiency of
> the evidence, in death penalty cases, this Court must conduct an
> independent review to determine whether sufficient evidence
> exists to support a first-degree murder conviction. . . .
>
> We conclude that the record contains competent, substantial
> evidence to support Durousseau's conviction for first-degree
> murder. First, at trial, the State established that Durousseau's
> DNA was found inside of Mack. The medical examiner testified
> that Durousseau's spermatozoa's heads and tails were still intact,
> indicating that Durousseau had sexual intercourse with Mack
> within hours of her death. Second, the State presented evidence
> that Mack suffered from abrasions on her face and marks on her
> arms and also presented evidence that Mack had been sexually
> battered. Third, witness testimony placed Durousseau at the scene
> of the homicide within hours of Mack's death. Both Williams and
> Pinkney identified Durousseau as the man they saw around
> Mack's apartment on the day she was murdered. The witnesses
> testified that Durousseau was wearing a navy[-]blue uniform. One
> of Durousseau's Goodyear coworkers testified that all employees
> were required to wear navy uniforms. Further, Pinkney testified
> that he saw Durousseau exit Mack's apartment building and look
> into the trunk of a red car. Additional testimony revealed that, at
> the time of Mack's murder in 1999, Durousseau owned a red
> Mazda. Fourth, Williams testified that she saw Durousseau place
> a television in the trunk of a red car. Mack's television set and

matching necklace and bracelet that she wore everyday were missing from her home when her body was found. Durousseau claims that Mack sold the television to him because it was broken. However, several of Mack's friends testified that the television had been working that same week. Fifth, the last contact Mack had with anyone was by phone between 1 and 1:30 p.m. that day, and testimony revealed that Durousseau took his lunch break between 12 and 1:30 p.m. that same day. A friend testified that she tried to contact Mack around 2:50 p.m., but Mack did not answer the phone. Mack's children and Durousseau's children attended the same small daycare. However, Durousseau denied knowing Mack on multiple occasions. Later, Durousseau claimed that he did know Mack and that he had a sexual relationship with her. Finally, the State established that Mack had been bound and sexually battered and died as a result of asphyxia caused either by strangulation or suffocation.

Based on a review of the evidence presented in this case, a "rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." *Simmons v. State,* 934 So.2d at 1111 (quoting *Bradley v. State,* 787 So. 2d 732, 738 (Fla. 2001)). Accordingly, we find the evidence sufficient to support Durousseau's first-degree murder conviction.

*Durousseau*, 55 So. 3d at 559–60 (internal citation modified).

Based on the foregoing, the Florida Supreme Court's decision was not based on an unreasonable determination of the facts in light of the evidence presented, and it was not contrary to, or an unreasonable application of, clearly established federal law. *See, e.g., Estelle v. McGuire*, 502 U.S. 62, 73–75 (1991) (finding that evidence that the infant victim suffered from battered child syndrome was relevant to establish intent for her murder, and holding that neither the introduction of such evidence nor the jury instruction on it so

28

infused the trial with unfairness as to deny due process, because even if the jury believed the petitioner committed the prior acts and used that as a factor in its deliberation, there was sufficient evidence to sustain such a finding by a preponderance of the evidence); *Thigpen v. Thigpen*, 926 F.2d 1003, 1005, 1015–16, 1019 (11th Cir. 1991) (holding the admission of evidence that the petitioner was previously convicted of another first-degree murder and received a death sentence, which was later reduced to life in prison, was relevant and admissible to show motive; its potential for undue prejudice did not substantially outweigh its probative value; and it did not render the trial so fundamentally unfair to violate due process, even in the absence of a limiting instruction to the jury to consider the evidence only for motive), *reh'g & reh'g en banc denied* (Apr. 29, 1991); *Shaw v. Boney*, 695 F.2d 528, 531 (11th Cir. 1983) (holding the admission of a witness's testimony concerning the petitioner's alleged threat to the murder victim did not render the petitioner's trial fundamentally unfair where the "testimony was neither a critical nor even a highly significant factor in the prosecution's case" and "the evidence against Shaw was overwhelming"); *Hills v. Henderson*, 529 F.2d 397, 401 (5th Cir. 1976) (holding that although the admission of evidence of a similar assault made subsequent to the assault at issue appeared to be improper under state evidentiary rules, the impropriety did not rise to denial of due process

considering the strength of the state's case).[17] But even if the Court should not give deference to the state court's adjudication as Durousseau suggests (*see* Doc. 12 at 10), the claims in Ground One would still be denied on the merits, assuming arguendo they were not procedurally defaulted. (*See* Docs. 10-4, 10-5, 10-6, 10-7, 10-8, 10-9, 10-10, 10-11, 10-12, 10-13, 10-14, 10-15, 10-16). Thus, Ground One is denied.

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1.     The Petition (Doc. 1) is **DENIED** and this action is **DISMISSED WITH PREJUDICE**.

2.     The Clerk of the Court shall enter judgment dismissing this action with prejudice, terminate any pending motions, and close the file.

---

[17] *Cf. Snowden*, 135 F.3d at 739 (concluding that "allowing expert testimony to boost the credibility of the main witness against Snowden—*considering the lack of other evidence of guilt*—violated his right to due process by making his criminal trial fundamentally unfair" (emphasis added)); *Davis v. Zant*, 36 F.3d 1538, 1551 (11th Cir. 1994) (concluding that pervasive prosecutorial misconduct, consisting of intentional misrepresentations that were both highly misleading to the jury and prejudicial to Davis, and that were calculated to undermine the crux of the defense, rendered the trial fundamentally unfair, considering "there was a substantial conflict in the relevant evidence"); *Panzavecchia v. Wainwright*, 658 F.2d 337, 341 (5th Cir. 1981) (holding the admission of evidence of the petitioner's counterfeiting conviction in his murder trial was prejudicial and in violation of due process, where the conviction was irrelevant to the murder charge and there were no proper instructions to the jury to relate the evidence only to the firearm possession charge).

3.     If Petitioner appeals this Order, the Court denies a certificate of appealability.[18] Because the Court has determined that a certificate of appealability is not warranted, the Clerk of the Court shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

**DONE AND ORDERED** at Jacksonville, Florida, this 31st day of March, 2026.

_____
JORDAN E. PRATT
UNITED STATES DISTRICT JUDGE

Jax-11 3/6
c:
Counsel of Record

---

[18] The court should issue a certificate of appealability only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke,* 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" *Miller–El v. Cockrell,* 537 U.S. 322, 335–36 (2003) (quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 n.4 (1983)). Upon due consideration of the record as a whole, this Court denies a certificate of appealability.